UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

MICHAEL SPRADLIN, and
NANCY SPRADLIN,

       Plaintiffs,

vs.

                                    Case No. 5:13-23381

AXA EQUITABLE LIFE INSURANCE COMPANY,

       Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiffs Michael Spradlin and Nancy Spradlin (collectively the "Plaintiffs"), by and through their counsel, W. Mark Burnette and the law firm Mark Burnette, P.A., hereby file this complaint (the "Complaint") against defendant AXA Equitable Life Insurance Company (the "Defendant").

## PARTIES

1.    Plaintiff Michael Spradlin ("Mr. Spradlin") is, and at all times relevant to this Complaint has been, a resident of Greenbrier County, West Virginia.

2.    Plaintiff Nancy Spradlin ("Mrs. Spradlin") is, and at all times relevant to this Complaint has been, a resident of Greenbrier County, West Virginia.

3.    Upon information and belief, Defendant is a corporation organized and existing under the laws of the state of New York. Its principal office is located at 1290 Avenue of the Americas, New York, New York 10104-0101.

4.     Upon information and belief, Defendant is authorized to conduct business in the state of West Virginia, having registered with the West Virginia Secretary of State as a foreign corporation.  Defendant does in fact conduct business in the state of West Virginia.

## JURISDICTION and VENUE

5.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Count II of this Complaint in that the claim for relief is based upon a federal statute. Accordingly, this Court has supplemental or ancillary jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 even if there was no diversity jurisdiction.

6.     This Court also has jurisdiction of this matter pursuant to the provisions of 28 U.S.C. § 1332 since there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

7.     Pursuant to 28 U.S.C. § 1391, venue of this legal action is properly with this Court because Defendant is subject to the Court's personal jurisdiction, and a substantial part of the events or omissions giving rise to the claims contained herein occurred in the Southern District of West Virginia.

## FACTS

8.     On or about June 1, 1984, Plaintiffs purchased two life insurance policies from Defendants (collectively the "Policies").[1]  This civil action arises from these Policies.

---

[1] The Policies were purchased nearly 30 years ago, and the corporate identity of the insurer was different from the named defendant.   Upon information and belief, Defendant is the successor entity to the company from which the policies were purchased and the proper defendant herein.

2

9.      Policy No. 34 615 542 (Policy 1) was issued to plaintiff Michael Spradlin as the owner and insured.  The beneficiary of this policy is plaintiff Nancy Spradlin.  This policy has a face amount and death benefit of $250,000.00.  This policy remains in force and effect today.

10.     In addition to the death benefit, Policy 1 has cash value.  Upon information and belief, the cash value of Policy 1 is approximately $145,000.00 as of the date of this Complaint.

11.     Policy No. 34 615 543 (Policy 2) was issued to plaintiff Nancy Spradlin as the owner and insured.  The beneficiary of this policy is plaintiff Michael Spradlin.  This policy has a face amount and death benefit of $250,000.00.   This policy remains in force and effect today.

12.     In addition to the death benefit, Policy 2 has cash value.  Upon information and belief, the cash value of Policy 2 is approximately $120,000.00 as of the date of this Complaint.

13.     Plaintiffs also purchased two other policies in or about 1984.  Policy Nos. 34 728 098 and 34 728 099 were issued to plaintiff Michael Spradlin as owner and beneficiary.  The insureds were his daughters, Leslie and Heather Spradlin, respectively.  Both of those policies have lapsed and are not the subject of this civil action.

14.     The monthly premium for Policy 1 and Policy 2 is $150 each, and it has been this amount, or close to this amount, since the Policies were purchased.  Plaintiffs have timely and faithfully paid their premiums for more than 29 years – approximately 351 months.  That is a total premium of approximately $52,650 per policy paid to date.

15.     The Policies were sold to Plaintiffs by Defendants' agent, Tom Holbrook ("Mr. Holbrook").  Mr. Holbrook retired sometime in the early 1990s and subsequently moved to Florida.  Plaintiffs' Policies were not reassigned to another agent by Defendant, and Plaintiffs had no personal contact with anyone with Defendant for approximately 15 years or more after Mr. Holbrook retired.

16.     In 1989, Plaintiffs needed money for various personal, household and family expenses.  Accordingly, they decided to take partial withdrawals from the cash value of their Policies rather than borrow money and incur interest expense.  Plaintiff Nancy Spradlin called Mr. Holbrook and requested the partial withdrawals, which Mr. Holbrook and Defendant processed.

17.     Upon information and belief, there were a total of three partial withdrawals, as follows:[2]

|   | | | |
|---|---|---|---|
| a. | February 7, 1989 | $1,511.00 | Policy 1 |
| b. | May 25, 1989 | $19,800.47 | Policy 1 |
| c. | May 25, 1989 | $15,000.00 | Policy 2 |

18.     At the time of making these partial withdrawals, and for approximately 21 years thereafter, Plaintiffs believed they had simply taken these three partial withdrawals from the accumulated cash value of the Policies.  Plaintiffs knew the Policies were still in force and effect and continued to make their monthly payments.

19.     In early 2010, Plaintiffs were contacted by one of Defendant's agents in Virginia, who informed them that the policy that insured the life of Heather Spradlin (Policy No. 34 728 099) was about to lapse because the loan and accumulated interest had exceeded the cash value.  Plaintiffs were completely unaware that there had been a loan on the policy, and could not understand why the policy would lapse.  Plaintiffs spent a considerable amount of time with various employees and agents of Defendant to discuss the situation.  These communications were the first time in more than 15 years that Defendant had any personal contact with Plaintiffs.

---

[2] Whenever the term "loan" is used in this Complaint, it refers to how Defendant has characterized these partial withdrawals and is not an admission by Plaintiffs that these partial

Early in these discussions, Plaintiffs paid one or more payments on Heather Spradlin's policy to prevent its lapse while they were attempting to understand the situation.

20.     During these communications with Defendant's employees and agents regarding Heather Spradlin's policy, Plaintiffs learned that their own Policies were in jeopardy for the same reason.   Defendant's employees and agents explained to Plaintiffs that the partial withdrawals they had taken in 1989 had been treated as loans.   As such, the amount withdrawn, along with a finance charge of eight percent (8%) per annum, had accumulated a balance that was nearing the cash value of the policies.   Defendant's agents further explained that when the loan balance exceeds the cash value of a policy, the policy will lapse.

21.     Upon learning this information, Plaintiffs insisted that they had never taken out any loans.   They had never made a loan payment nor been asked for a payment from the time the partial withdrawals were made in 1989 until being informed by Defendant of its treatment of the withdrawals in 2010.   Plaintiffs spent considerable time, effort and money contacting various representatives of Defendant asking for proof that they had taken out loans.

22.     Defendant has admitted that a contract, promissory note, pledge of any security, or any other documentation of a loan does not exist and has never existed.   Defendant has admitted that it never has requested any payment on the "loans."

23.     Defendant has informed Plaintiffs that in 1989, it made policy loans by verbal request of an agent.

24.     Upon information and belief, it is in the best interests of Defendant and its agent to treat partial withdrawals as loans.   In the former case, Defendant and the agent lose control of

withdrawals were in fact "loans."   Plaintiffs deny that they were loans.

5

the money.  In the latter, not only do they keep control of the money, but they earn interest on it at a rate that far exceeds a reasonable rate.

25.     Pursuant to the scheme perpetrated upon Plaintiffs by Defendant, the insurer "loans" its policy holder its own money and charges the policy holder an exorbitant rate of interest.  The interest rate is exorbitant because the loan is completely risk-free.  It is fully secured by cash that is held and controlled by the insurer-lender.  Furthermore, the insurer intentionally hides from the policy holder the fact that it has treated the partial withdrawal as a loan by completing no loan documentation, requiring no signatures, and sending no statements or requests for loan payments.

26.     The balance of the "loan" increases at the rate of eight percent (8%) per annum because no payments are being made.  The cash value of the policy increases at a smaller rate because the investment returns are less than 8%.  This causes a gradual decrease of the difference between the loan balance (which is increasing) and the cash value (which is usually also increasing but at a smaller rate).  Eventually, this causes the balance of the loan to exceed the cash value, which causes the policy to lapse.  The effect on the policy holder is that he or she pays premiums for a very long time, as Plaintiffs have, and the insurer eventually takes that money and provides no benefit to the policy holder, who is left with no cash value and no insurance.

27.     According to financial statements reported by Defendant to the United States Security and Exchange Commission, as of June 30, 2013, it had $3.45 billion in outstanding policy loans, or 7.5% of its total investment portfolio.  These policy loans generate approximately $276 million annually in interest income for Defendant with absolutely no risk.

Defendants' stockholders and executives benefit, while their policy holders lose their life savings and life insurance benefits – all due to the deception of Defendant.

## COUNT I

## DECLARATORY JUDGMENT

### W. Va. Code § 55-13-1 et seq.

28.     For Count I of this Complaint, Plaintiffs incorporate by reference all allegations made in Counts 8-27 of this Complaint.

29.     Plaintiffs seek a declaratory judgment that there is no loan contract between them and Defendant, and that Plaintiffs never entered into a loan agreement with Defendant.

30.     There is a justiciable controversy between Plaintiffs and Defendant in that Defendant has clearly informed Plaintiffs that it deems a loan to exist between the parties and that each of Plaintiffs' Policies will lapse when the loan balance exceeds the cash value, thereby wiping out 30 or more years of savings and the death benefits of the Policies.  Plaintiffs believe Defendant will do this (take the cash value as a balloon loan payment and cancel the policy) because it did so with Heather Spradlin's policy.  Accordingly, this matter is appropriate for declaratory judgment.

31.     There is no contract, promissory note, pledge of security, or any other written documentation that evidences a loan between Plaintiffs and Defendant.

32.     Plaintiffs never intended to enter into a loan agreement with Defendant, and did not know until 2010 that Defendant considered loan agreements to exist between Plaintiffs and Defendant.  Accordingly, there was no "meeting of the minds" or "mutual assent" of the parties.

## COUNT II

## VIOLATION OF TRUTH IN LENDING ACT

## 15 U.S. Code § 1601 et seq.

## 12 C.F.R. 226.1 et seq.

33.     For Count II of this Complaint, Plaintiffs incorporate by reference all allegations made in Counts 8-27 of this Complaint.

34.     The Truth in Lending Act ("TILA" - 15 U.S.C. § 1601 et seq.) and its implementing regulations (Regulation Z – 12 C.F.R. 226.1 et seq.) require a lender to make certain conspicuous disclosures to a borrower in writing in a form the borrower may keep.  These disclosures include, but are not limited to:  (1) the identity of the creditor; (2) the amount financed; (3) an itemization of the amount financed; (4) the finance charge, (5) the annual percentage rate, (6) the payment schedule; and (7) the total of payments.

35.     Defendant made no such disclosures to Plaintiffs.

36.     As a direct and proximate result of the failure to disclose pertinent information about the "loan" as required by TILA, as described in detail herein, Plaintiffs have suffered and continue to suffer actual harm and are entitled to damages, including damages for expenses incurred, attorneys fees and costs, loss of income, substantial mental anguish, loss of consortium, emotional distress, aggravation, annoyance and inconvenience, and punitive damages.

## COUNT III

## UNFAIR AND DECEPTIVE TRADE PRACTICES

### INSURANCE BAD FAITH

#### W. Va. Code § 33-11-4

37.     For Count III of this Complaint, Plaintiffs incorporate by reference all allegations made in Counts 8-27 of this Complaint.

38.     West Virginia insurance law allows policy loans only upon proper assignment of pledge of the policy and on the sole security thereof.  Plaintiffs have not assigned their Policies to Defendant, and Plaintiffs have not pledged their Policies, or the cash values of their Policies, as security for any loan.

39.     West Virginia insurance law allows a maximum annual interest rate on a policy loan of six percent (6%) unless the insurer has obtained permission from the West Virginia Insurance Commissioner to charge a higher rate, the maximum of which is eight percent (8%) pursuant to West Virginia law.

40.     In order to obtain permission to charge an annual rate of interest greater than six percent (6%), the insurer must assure the West Virginia Insurance Commissioner that the policy holder will benefit from higher dividends, lower premiums, or both.

41.     Since the inception of these "loans," Defendant has charged Plaintiffs eight percent (8%) annual interest, but it has not obtained permission from the West Virginia Insurance Commissioner to do so.

42.     West Virginia insurance law requires an insurer to notify a policyholder at the time a policy loan is made of the initial rate of interest on that loan.

43.     Defendant did not notify Plaintiffs at the time the "loans" were made of the initial rate of interest on those "loans."

44.     West Virginia insurance law defines "unfair and deceptive trade practices" to include any statement or omission made by an insurer that is a misrepresentation for the purposes of effecting a pledge or assignment of, or effecting a loan against, an insurance policy.

45.     Defendant has committed unfair and deceptive trade practices by failing to inform, and intentionally misrepresenting and concealing, the nature of the transaction that Plaintiffs viewed as partial withdrawals of the cash value of their Policies.

46.     West Virginia insurance law defines "unfair and deceptive trade practices" to include knowingly making any false entry of a material fact in any book, report or statement of any person or knowingly omitting a true entry of any material fact pertaining to the business of any person in any book, report or statement of such person.

47.     Defendant has committed unfair and deceptive trade practices by knowingly falsely characterizing the partial withdrawals taken by Plaintiffs as loans secured by their Policies when in fact no such loans were taken.

48.     As a direct and proximate result of the unfair and deceptive trade practices by Defendant, as described in detail herein, Plaintiffs have suffered and continue to suffer actual harm and are entitled to damages, including damages for expenses incurred, attorneys fees and costs, loss of income, substantial mental anguish, loss of consortium, emotional distress, aggravation, annoyance and inconvenience, and punitive damages.

## COUNT IV

## VIOLATION OF THE
## WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT

### W.Va. Code § 46A-1-101 et seq.

49.     For Count IV of this Complaint, Plaintiffs incorporate by reference all allegations made in Counts 8-27 of this Complaint.

50.     Defendant is regularly engaged in the business of making loans.

51.     Plaintiffs are natural persons and are not organizations.

52.     None of the partial withdrawals made by Plaintiffs, which Defendant deems to have been loans, exceeded the principal amount of forty-five thousand dollars ($45,000.00) individually, and the combined sum of all the partial withdrawals did not exceed forty-five thousand dollars ($45,000.00).

53.     Upon information and belief, Defendant intended that the loan(s), which Plaintiffs believed were partial withdrawals, would be repaid by Plaintiffs in one balloon payment of principal and accrued interest.

54.     The loan(s) made to Plaintiffs by Defendant were willfully induced by unconscionable conduct in that Defendant never informed Plaintiffs that they were entering into a loan agreement.

55.     Defendant did not provide any written documentation to Plaintiffs notifying them in a conspicuous manner that they were obligating themselves to a loan with a balloon payment.

56.     To the extent Plaintiffs have entered into loan(s) with Defendant, Defendant has willfully engaged in conduct that creates the likelihood of confusion or misunderstanding.

11

57.     To the extent Plaintiffs have entered into loan(s) with Defendant, Defendant has willfully acted, used or employed deception, fraud, false pretense, false promise or misrepresentation, or has concealed, suppressed or omitted material facts with the intent that Plaintiffs rely upon such concealment, suppression or omission.

58.     As a direct and proximate result of the violations by Defendant of the West Virginia Consumer Credit and Protection Act, as described in detail herein, Plaintiffs have suffered and continue to suffer actual harm and are entitled to damages, including damages for expenses incurred, attorneys fees and costs, loss of income, substantial mental anguish, loss of consortium, emotional distress, aggravation, annoyance and inconvenience, and punitive damages.

## COUNT V

## FRAUD

59.     For Count V of this Complaint, Plaintiffs incorporate by reference all allegations made in Counts 8-27 of this Complaint.

60.     Defendant's act of misrepresenting and concealing its characterization of Plaintiff's partial withdrawals as loans, and everything that resulted therefrom including the accrual of interest and the existence of a large balloon payment that will completely wipe out the cash values of Plaintiffs' policies, is an act of fraud.

61.     Defendant's act of misrepresenting and concealing the nature of the partial withdrawal transactions and the large balloon payments was designed to mislead Plaintiffs and induce them into entering into a loan agreement that they never intended to enter and did not know that they had entered.

62.     Plaintiffs relied on the misrepresentation and concealment by Defendant in that they believed for more than twenty (20) years, and still believe today, that they took partial withdrawals from the cash value of their policies and did not enter into loan agreements.

63.     As a direct and proximate result of the fraudulent misrepresentation and concealment by Defendant, as described in detail herein, Plaintiffs have suffered and continue to suffer actual harm and are entitled to damages, including damages for expenses incurred, attorneys fees and costs, loss of income, substantial mental anguish, loss of consortium, emotional distress, aggravation, annoyance and inconvenience, and punitive damages.

## COUNT VI

### BREACH OF FIDUCIARY DUTY

64.     For Count VI of this Complaint, Plaintiffs incorporate by reference all allegations made in Counts 8-27 of this Complaint.

65.     Defendant's agent, Mr. Holbrook, solicited Plaintiffs to sell them the Policies.

66.     Mr. Holbrook's status as Defendant's agent, and the trust placed in him by Plaintiffs, created a fiduciary relationship between Defendant and Plaintiffs.

67.     As part of the fiduciary relationship between Defendant and Plaintiffs, Defendant owes Plaintiffs an obligation to care for and manage their money in a reasonable manner.

68.     Mrs. Spradlin called Mr. Holbrook about the partial withdrawals, and she trusted him to handle the withdrawals.

69.     Neither Mr. Spradlin nor Mrs. Spradlin signed any documentation regarding a loan, and neither of them were ever informed by Mr. Holbrook or any other agent of Defendant that they were taking out a loan.

13

70.     Defendant and Mr. Holbrook breached their fiduciary obligations to Plaintiffs by arranging for the partial withdrawals to be treated as loans, and concealing this fact from Plaintiffs.

71.     The act of characterizing the partial withdrawals as loans and concealing this information from Plaintiffs were breaches of the fiduciary obligations owed to Plaintiffs by Defendant and Mr. Holbrook, and constitute fraudulent conduct.

72.     Mr. Holbrook retired within a few years of the partial withdrawals being made in 1989.  Defendant never replaced Mr. Holbrook with another agent.  Accordingly, Plaintiffs had no agent for at least 15 years.

73.     The continued act of treating the partial withdrawals as loans and allowing them to accrue interest during this period when Defendant assigned no agent to Plaintiffs was a further breach of the fiduciary obligations owed by Defendant to Plaintiffs.

74.     As a direct and proximate result of the breach of the fiduciary relationship by Defendant and its former agent, Mr. Holbrook, as described in detail herein, Plaintiffs have suffered and continue to suffer actual harm and are entitled to damages, including damages for expenses incurred, attorneys fees and costs, loss of income, substantial mental anguish, loss of consortium, emotional distress, aggravation, annoyance and inconvenience, and punitive damages.

## **REQUEST FOR JUDGMENT**

**WHEREFORE,** Plaintiffs respectfully request judgment against Defendants as follows:

1.     A declaratory judgment that no loan contract exists between Plaintiffs and Defendant;

14

2.      Cancellation of any debt purportedly owed by Plaintiffs to Defendant;

3.      Compensatory and general damages in an amount to be determined by the jury or other trier of fact at trial;

4.      Punitive damages in an amount to be determined by the jury or other trier of fact at trial;

5.      Attorneys' fees and all costs incurred by Plaintiffs in pursuing this action;

6.      Pre-judgment and post-judgment interest as permitted by law; and

7.      Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

**FILED** this 21st day of September 2013.

MICHAEL SPRADLIN, and
NANCY SPRADLIN,

Plaintiffs,

BY COUNSEL:

/s/ Weldon Mark Burnette

_____

Weldon Mark Burnette
MARK BURNETTE, P.A.
West Virginia Bar No. 6408
Post Office Box 2913
Ocala, Florida 34478
Telephone:     (352) 216-1889
E-Mail:           burnette_mark@yahoo.com