# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

MICHAEL SPRADLIN and
NANCY SPRADLIN,

                Plaintiffs,

v.                                     CIVIL ACTION NO.   5:13-cv-23381

AXA EQUITABLE LIFE INSURANCE
COMPANY,

                Defendant.


## MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Plaintiffs' Motion for Partial Summary Judgment* (Document 49), the *Plaintiffs' Memorandum of Law in Support of Their Motion for Partial Summary Judgment* (Document 50) and attached exhibits,[1] the *Defendant AXA Equitable Life Insurance Company's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment* (Document 57) and attached exhibits, and the *Plaintiffs' Reply to Defendant's Response to Their Motion for Partial Summary Judgment* (Document 60) and attached exhibits.   The Court has also reviewed the *Defendant AXA Equitable Life Insurance Company's Motion for Summary Judgment* (Document 51) and attached exhibits,[2] the *Defendant AXA Equitable Life Insurance Company's*

---

1 Local Rule of Civil Procedure 7.1(a)(1) specifies that any exhibits "upon which the motion relies shall be attached to the motion, not the supporting memorandum."   The Plaintiffs did submit courtesy copies in compliance with Local Rule 7.1(a)(5), and the Court has reviewed all exhibits despite the Plaintiffs' non-compliance with Local Rule 7.1(a)(1).

2 The Defendant filed an amended version of its Exhibit J on September 11, 2014, as document 68-1.   The original Exhibit J included documentation related to Mr. and Dr. Spradlin's policies, including various changes made in the late 1980s through their insurance agent, beneficiary changes, and their original insurance applications.   The updated Exhibit J includes the life insurance policies for both Mr. and Mrs. Spradlin.

*Memorandum of Law in Support of Its Motion for Summary Judgment* (Document 52), the *Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment* (Document 61) and attached exhibits, and the *Defendant AXA Equitable Life Insurance Company's Reply in Support of Its Motion for Summary Judgment* (Document 62) and attached exhibits.  For the reasons stated herein, the Court finds that the Plaintiffs' motion must be granted as to Count I, denied as moot as to Count II, and the Defendant's motion must be denied as to Count I, denied as moot as to Count II and Count IV, and granted as to Count III, Count V and Count VI.

## I.       FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

The Plaintiffs initiated this action with a *Complaint for Declaratory Judgment and Other Relief* (Document 1) filed in this Court on September 21, 2013.   In essence, they allege that their life insurance policies are in danger of being foreclosed by the Defendant because the Defendant misclassified partial cash withdrawals taken in 1989 as loans.   They assert causes of action for (1) declaratory judgment, (2) violation of the Truth in Lending Act, (3) Unfair and Deceptive Trade Practices: Insurance Bad Faith, (4) violation of the West Virginia Consumer Credit and Protection Act, (5) fraud, and (6) breach of fiduciary duty.

The Plaintiffs purchased the term life insurance policies in question in 1984.   (Policies, Def. Am. Ex. J, Document 68-1.)   They purchased the policies through Equitable Agent Tom Holbrook, who was also a personal friend.   He assisted them in transactions related to their policies, including adjusting the premium and coverage amounts and changing beneficiaries.

---

3 Because there are cross-motions for summary judgment, the Court must view the facts and inferences in the light most favorable to the Defendant while considering the Plaintiffs' motion, and in the light most favorable to the Plaintiffs while considering the Defendant's motion.   For purposes of this portion of the opinion, the Court will note the party promoting any disputed fact without drawing inferences for either party.

(*See generally* Def. Original Ex. J, Document 51-5.)   The policies include terms regarding policy loans, including the interest rate of 8%, and partial cash value withdrawals.   (Policy at 10, 13.) The policy language specifies that a partial cash withdrawal constitutes a "policy change," which must be requested "by completing an application for change, which you can get from our agent or by writing to us."   (*Id.* at 10.)   Further, "[t]he insurance amount, the cash value and the amount in the Policy Account will all be reduced by an amount equal to the amount withdrawn, and the period of coverage may be shortened," but "you may ask for an alternative policy change" rather than a decrease in the insurance amount, if desired.   (*Id.*)   The policy does not describe how to take out a policy loan, but explains that the policy "will be the only security for the loan," which cannot be in an amount greater than the cash value.   (*Id.* at 13.)   It further explains that the policy "will terminate when a loan with loan interest first equals or exceeds the cash value."   (*Id.*)   It specifies how to repay a loan "by paying us or by decreasing the cash and Policy Account values with a resultant change in the policy."   (*Id.*)

In 1989, the Spradlins decided to purchase a condo at Myrtle Beach.   Dr. Nancy Spradlin managed the couple's finances at the time, and she took money from the life insurance policies to use for a down payment on that condo.   (N. Spradlin Depo., at 19, att'd as Ex. C to Pl.'s Reply, Document 60-1.)   Central to the instant dispute, the Spradlins characterize the money taken from the policies as withdrawals, while AXA Equitable characterizes it as policy loans.

Dr. Spradlin recalls taking $19,800.47 from the cash value of Mr. Spradlin's policy and $15,000 from her policy in May of 1989.   (*Id.* at 17.)   She reported that she had no recollection of an additional transaction removing $1,511 from Mr. Spradlin's policy in February of 1989, which appears in the account history.   (*Id.*)   No written documentation of the transactions at the time

3

they were made exists.   An annual report for the year ending May 31, 1989, for Nancy Spradlin shows a face amount of $387,000, a cash value of $16,818.85, and a new loan of $15,000.   (Def. Ex. E, Document 51-3 at 52.)   An annual report for the year ending May 31, 1989, for Michael Spradlin shows a face amount of $300,000, a cash value of $ 23,830.60, and new loans of $21,345.95.   (*Id.*, Document 51-2 at 54.)

Mr. Spradlin contends that he was not aware, in 1989, that money was taken out of his policy and did not authorize either loan.   (M. Spradlin Depo., at 20–21, att'd as Ex. B to Pl.'s Reply, Document 60-1.)   His wife handled the purchase of the condo and all financial matters. (*Id.* at 29, 27.)   He did not review annual statements for the policies he owned. They were sent to Dr. Spradlin's office, and he does not recall discussing them with her.   (*Id.* at 25.)   Both Dr. Spradlin and Mr. Spradlin stated that they relied on Mr. Holbrook, or occasionally his partner, for all advice and transactions related to their insurance policies until his retirement in 1995.   (*Id.* at 16, 25; N. Spradlin Depo. at 18–19, 26.)

Mr. Holbrook stated that he recalled a conversation with Dr. Spradlin about the possibility of using money from the policies to purchase a condo through a policy loan, but did not recall having any involvement in the process.   (Holbrook Depo. at 14–17; att'd as Ex. D. to Pl.'s Reply, Document 60-2.)   He believes the conversation focused on a loan rather than a withdrawal.   (*Id.* at 47–49.)   Both Mr. Holbrook and Henry Lewer, a senior director at AXA Equitable, explained that customers could request a policy loan through their agent or through a direct customer service call.   (*Id.* at 17; H. Lewer Depo. at 17, att'd as Ex. E to Pl.s' Reply, Document 60-2.)   Mr. Lewer further stated that AXA Equitable's procedures permit a policy owner to call with a third party, be authenticated as the owner by the customer service representative, and authorize a third party to

4

make a request, after which no further input or confirmation by the owner would be required.   (H. Lewer Depo. at 14–16.)   Based on these facts, AXA Equitable contends that Dr. Spradlin was authorized by Mr. Spradlin to take money from his policy and that she did so through a direct call to the AXA Equitable Service Center.   (Def.'s Resp. at 3; Def.'s Mem. in Support of Def.'s Mot. at 2.)

There is no written documentation of the transaction, nor are there statements or bills specific to the loans.   AXA Equitable mailed annual reports for each policy.   These statements changed format over the years, but always included the premium, the face amount or death benefit, the cash value (increasing with interest each year), and the policy loans.   The 1989 annual reports show loan transactions on specific dates, but do not appear to list an interest rate for the loans. (Ex. E to Def.'s Mot., Document 51-2 at 54–55; Document 51-3 at 52–53.)   The 1990 annual reports continue to list the loan balances, but do not show an increase in the total loan balance for interest, nor do they reveal an interest payment. (*Id.* Document 51-2 at 56–57; Document 51-3 at 54–55.)   Beginning in 1991, new loans, in the amount of the accrued interest, are listed and added to the loan balance each year—though the interest rate on loans still is not listed.   (*Id.* Document 51-2 at 58–59; Document 51-3 at 56–57.)   Beginning around 2000,[4] AXA Equitable reformatted the annual statements, and those issued since that date do include the loan interest rate of 8% and an explanation that "outstanding indebtedness (loan plus accrued loan interest) will be deducted from the death benefit and cash surrender value proceeds."   (*Id.*, e.g., Document 51-2 at 46–49.)   Dr. Spradlin stated that she reviewed the annual reports, or at least the first page of them, but did not pay attention to the loan section because "[i]t looks like something you get in one of

---

4 The Defendant included annual statements as Exhibit E to its motion for summary judgment, but they were not entirely organized by date, and the Court was unable to locate annual reports for 1998 and 1999.

those credit card things that you would want to throw in the trash" and "I didn't have a loan, so it didn't apply to me."   (N. Spradlin Depo. at p. 49–50.)

The Spradlins continued paying their monthly policy premiums.   They took withdrawals from Mr. Spradlin's daughters' policies in 1997, but otherwise had no contact with AXA Equitable beyond automatically paying their premiums and automatically receiving annual statements until 2009.   In 2009 or 2010,[5] Mr. Spradlin met Justin Kerns, an agent based in Covington, Virginia, and learned that one of his daughters' policies had lapsed due to a loan taken out in 1994.[6]   (M. Spradlin Depo. at 33–34.)   Mr. Kerns brought the loans listed on Dr. and Mr. Spradlin's policies to their attention as well.   (*Id.*; N. Spradlin Depo. at 33.)

Mr. Spradlin began investigating the alleged loans and seeking information from various AXA Equitable agents and employees.   He also wrote a letter to Operations Manager L. J. Smith on March 25, 2010, explaining that "a modest amount of money that we withdrew in 1989…was processed as a loan" and that they had been led to believe the withdrawals "were routine transactions without any risk to our policies."   (3/25/2010 Letter, M. Spradlin to L. Smith, att'd as Ex. H to Def.'s Mot., Document 51-5.)   Lucretia Swain-Arnold, a Customer Relations employee at AXA Equitable, responded that "[t]he decision to process a loan or a partial withdrawal and the amount is solely that of the policyholder," and "[i]f a loan is processed, interest will accrue daily at a specified rate and be billed annually on the anniversary of the policy."   (5/11/2010 Letter, L. Swain-Arnold to Spradlins, att'd as Ex. G to Pl.s' Mot., Document 50-2.)   She provided information about how loans are processed, how policies may lapse without interest payments, and

---

5 In his deposition, Mr. Spradlin stated that the conversation took place in 2009.   In a letter written to L.J. Smith, an Operations Manager at AXA Equitable, on March 25, 2010, he refers to a January 2010 conversation.   (3/25/2010 Letter, M. Spradlin to L. Smith, att'd as Ex. H to Def.'s Mot., Document 51-5.)
6 That transaction is not at issue in this case.   However, the Court notes that Dr. and Mr. Spradlin both stated that they had no recollection of taking the $1,300 loan.

indicated that "an annual billed loan interest notice is mailed to the address of record approximately 21 days prior to the anniversary" in addition to the annual reports, both of which include information about the loans and accruing interest.[7]   (*Id.*)   She further wrote that the company had "determined that the loans…were in accordance with the terms and provisions of the plans and pursuant to your requests as owners," and indicated that AXA Equitable would not alter its treatment of the transactions as loans.   (*Id.*)

The Spradlins followed up with a letter dated June 14, 2010, reiterating that they had requested withdrawals and that Mr. Holbrook had never informed them "that the withdrawals were treated as loans and that the interest accruing on them was significantly reducing the value of [their] policies."   (6/14/2010 Letter, Spradlins to L. J. Smith, att'd as Ex. I to Def.'s Mot., Document 51-5.)   AXA Equitable responded with a letter from Lisa Eisenhart, again stating that the records reflect loan dispersals and explaining that annual billed loan interest notices and annual reports are mailed after loans are dispersed.   (7/16/2010 Letter, L. Eisenhart to Spradlins, att'd as Ex. H to Pl.s' Mot., Document 50-2.)   "If you thought the disbursements were partial withdrawals, we should have been contacted after you received the first billed loan interest notices and Annual Reports reflecting the outstanding loans," she wrote.   (*Id.*)   Mr. Spradlin continued to investigate with assistance from attorney Lawrence Morhous, a personal acquaintance, who wrote Mr. Lewer seeking all relevant documents on August 10, 2011.   (08/10/2011 Letter, L. Morhous to H. Lewer, att'd as Ex. C to Def.'s Reply, Document 62-1.)   Continued informal communications failed to resolve the dispute, and the Plaintiffs filed this suit.

---

7 Neither party has produced annual billed interest statements in this case.   Counsel for the Plaintiffs presented the following question to Mr. Lewer: "In this case, I see none of these billing notices until very late, I think after 2010.   So my question to you is, can a policyholder take out a loan and not be billed interest, principal, or anything ever?"   Mr. Lewer responded, "No."   (H. Lewer Depo. at 34.)

## II.     STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).   A "material fact" is a fact that could affect the outcome of the case.   *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.   *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23.   When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party.   *Hoschar*, 739 F.3d at 169.   However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor."   *Anderson*, 477 U.S. at 256.   "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action."   *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at

*3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd*, 474 F. App'x 101 (4th Cir. 2012). Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

### III.    DISCUSSION

The Plaintiffs request partial summary judgment as to Count I, seeking declaratory judgment that no loan contract exists, and Count II, alleging violation of the Truth in Lending Act. The Defendant seeks summary judgment as to all counts.

#### A.  Declaratory Judgment

The Uniform Declaratory Judgments Act imbues courts with the "power to declare rights, status and other legal relations whether or not further relief is or could be claimed."   W. Va. Code Ann. § 55-13-1 (West).   In this case, the parties agree that the Spradlins' life insurance policies are at risk of lapsing due to the accruing loan interest, and that AXA Equitable will foreclose the policies if the loans exceed the account values.   The dispute centers on whether the 1989 transactions were properly classified as loans or withdrawals.   Accordingly, declaratory judgment is an appropriate form of relief.

#### i.    Requirement of Written Contract

As an initial matter, the Plaintiffs claim that, as a matter of law, there can be no valid loan contract without a writing.   They argue that (1) the Statute of Frauds requires a writing for this contract to be enforceable and (2) West Virginia Code §§ 33-13-8 and 33-13-8a, governing loans on life insurance policies, require a writing and notification of the initial interest rate at the time of the loan.   AXA Equitable argues that the Plaintiffs are not entitled to declaratory judgment because the "policy terms govern the policy loan and the interest rate," and so no separate writing is required.   (Def.'s Mem. in Supp. of Mot. Summ. J. at 7–8.)   Further, the annual statements "fully disclos[ed] the policy loans."   (Def.'s Resp. at 5.)   It responds to the Plaintiffs' argument

that a separate writing is required by invoking the exception to the statute of frauds for contracts that could be completed within one year.

The Court finds that the Defendant failed to comply with West Virginia law regarding loans on insurance policies.  West Virginia Code § 33-13-8a requires life insurance companies making loans to "notify the policyholder at the time a cash loan is made of the initial rate of interest on the loan" and to "include in the notices" certain other provisions regulating interest rates. W.Va. Code § 33-13-8a(f).  The language of the statute clearly contemplates a mailed notice. There is no evidence that the Defendant mailed any such notice.[8]  Indeed, the Defendant contends that no writing is required.

The Plaintiffs contend that an insurance policy loan, by law, must be in writing, and that the alleged loans on their policies are, therefore, unenforceable.  The Court finds that the Statute of Frauds is not applicable here because the alleged loan contract could be performed within one year, either by repayment of the loan or by the death of the insured.  However, another provision of the statute regulating life insurance, West Virginia Code § 33-13-8(a), provides:

> There shall be a provision that after the policy has a cash surrender value and while no premium is in default beyond the grace period for payment, the insurer will advance, on proper assignment of pledge of the policy and on the sole security thereof, at a specified rate of interest not exceeding eight percent per annum, or seven and four-tenths percent per annum if payable annually in advance, an amount equal to or, at the option of the party entitled thereto, less than the loan value of the policy.

*Id.* § 33-13-8(a).  The statute does not explicitly require written loan contracts, but appears to contemplate greater formality than a telephone call with no written documentation.  The Plaintiffs' interpretation that written contracts are required, based on case law defining the

---

8  The annual statements include the loans, but those issued prior to at least 1998 do not include the loan interest rate, and so could not be read to fulfill the company's obligations pursuant to § 33-13-8a.

terminology contained in the provision in other contexts, is reasonable.   Like the provision requiring notice of interest rates, it places duties on the insurer at the time the loan is made, not merely at the time the policy is issued.   The policy is to have provisions for loans, but the loan is to be advanced "on proper assignment of pledge of the policy."

West Virginia Code, Title 33, Chapter 13, does not contain an enforcement provision, and there is no case law interpreting either relevant provision (though both were in place well before the 1989 transactions at issue here).   In this case, there is a great deal of dispute regarding whether a policy loan exists under basic contract principles.   If there is no evidence that a loan contract was formed, then the statute regulating policy loans has no bearing on this case.   The impact of these provisions on an otherwise valid and enforceable policy loan is not clear.   This Court need not interpret and devise a remedy for violation of the statute absent a finding that the alleged policy loans would otherwise be enforceable.

## ii. Contract Formation

Turning to the parties' arguments regarding the existence of a policy loan contract, the Plaintiffs assert that "the burden of proving the existence of a contract is generally on the party asserting it."  (Pl.s' Mem. in Supp. of Mot. Summ. J. at 14.)  They claim that the Defendant cannot meet that burden because it has no documentation of the alleged loan and no witnesses with any knowledge or memory of the transaction.   As to Mr. Spradlin in particular, they assert that the evidence suggests no involvement or authorization from him as owner of the policy.

In the Plaintiffs' version of the facts, "Nancy called the local AXA agent…and informed him that she wanted to withdraw money from each of the Plaintiffs' accounts."  (*Id.* at 5.)  They obtained the money and gave no further thought to the transactions until AXA Equitable Agent

Justin Kerns informed them that the transactions had been classified as loans and accrued interest since 1989. Neither Plaintiff knew about or authorized the $1,511 loan from Mr. Spradlin's policy. Dr. Spradlin had requested withdrawals of $15,000 from her own policy and about $19,800 from Mr. Spradlin's policy, but knew nothing about loans or interest rates, and Mr. Spradlin had not authorized the withdrawal or loan on the policy he owned. The only documents they received at the time were the checks. Unaware of the loans, they paid no special attention to the annual statements. Dr. Spradlin briefly reviewed them and Mr. Spradlin did not look at them. They continued paying their premiums each month and had little contact with AXA Equitable after their agent retired in 1995.

AXA Equitable argues that "the central issue in this dispute" is that the "Plaintiffs had notice and knowledge of the policy loans, received the benefit of the money loaned to them, and chose to ignore over twenty annual statements specifying the principal and interest accrued on their loans." (Def.'s Resp. at 1–2.) It asserts that any documentation generated at the time the alleged loan was made would have been destroyed after seven years, but the documentation of the loans "is preserved and maintained in the Annual Reports." (*Id.* at 5.) In sum, it argues that "there are valid life insurance policies; Plaintiffs do not dispute that they received money from the life insurance policies…; and Plaintiffs received annual statements evidencing the policy loans for more than twenty years." (*Id.* at 7.)

The Defendant contends that Dr. Spradlin discussed taking out a policy loan with Mr. Holbrook, their local agent, and learned that policy loan interest rates were favorable in comparison to bank interest rates at the time. He recommended a loan rather than a withdrawal because a withdrawal would have reduced the policy values. AXA Equitable speculates that she

13

then contacted AXA Equitable directly to obtain the loans, which were issued in accordance with company policies and procedures.   Also relying on company procedures, it argues that Mr. Spradlin must have authorized Dr. Spradlin to take the money from his policy.   The company mailed the check, and the Spradlins received and used the money to purchase a condo at Myrtle Beach.   AXA Equitable mailed annual statements each year, showing the loans with increasing balances, and the Spradlins failed to pay either the principal or accumulating interest.   Though agents were available locally, neither of the Plaintiffs contacted AXA Equitable to complain about the characterization of the transactions until 2010.

The Defendant is correct that the policies themselves contain terms relevant to both policy loans and cash withdrawals.   However, this dispute is not primarily about the terms.[9]   It is about which transaction took place.   It is undisputed that the Spradlins obtained and used money from their insurance policy accounts—but the policies permitted clients to obtain such funds via either a policy loan or a partial cash withdrawal.   AXA Equitable permits loans below a certain amount[10] to be made by verbal request, and any documentation related to the Spradlins' request no longer exists.   Thus, the Court must consider whether genuine issues of material fact exist as to whether a valid contract for a loan was formed.

State law governs contract formation.   West Virginia law requires an offer and acceptance, with a meeting of the minds as to what the contract entails.   *Nichols v. Springleaf Home Equity Inc.*, 2012 WL 777289 at *3 (S. D. W. Va. Mar. 8, 2012) (Chambers, C.J.) (citing

---

9 The Plaintiffs do argue that the interest rate charged on loaned funds does not comply with West Virginia law because it was not properly supported with evidence of advantages to consumers for approval by the insurance commissioner.   That argument is addressed in footnote 12.   However, they seek a declaration simply that there was no loan, and accordingly, no interest.

10 The dollar amount has changed over the years.   AXA Equitable has not produced evidence of the dollar limit in place in 1989.

*Brown v. Woody,* 127 S.E. 325, 326–27 (W.Va. 1925)); *see also Charbonnages de France v. Smith*, 597 F.2d 406, 417 (4th Cir. 1979)(discussion methods of proof of manifestation of mutual assent).    "West Virginia contract law requires mutual assent to form a valid contract."   *New v. GameStop, Inc.*, 753 S.E.2d 62, 70 (W. Va. 2013); *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450-51 (W. Va. 1993).   Though no directly on-point West Virginia law so states, it is a generally accepted rule that "[t]he party asserting the existence of an enforceable contract bears the burden of proof on the issue of contract formation."   *Novecon Ltd. v. Bulgarian-Am. Enter. Fund*, 190 F.3d 556, 564 (D.C. Cir. 1999); *see also Doe v. United States*, 95 Fed. Cl. 546, 582 (Fed. Cl. 2010); *TruePosition, Inc. v. LM Ericsson Tel. Co.*, 977 F. Supp. 2d 462, 467 (E.D. Pa. 2013); *In re Oakley*, 397 B.R. 36, 44 (Bankr. S.D. Ohio 2008) *aff'd sub nom. In re Oakely*, 431 B.R. 307 (B.A.P. 6th Cir. 2009) (noting that authority is split as to whether the proponent of a contract must prove its existence by a preponderance of the evidence or by clear and convincing evidence.)

A written contract signed by both parties would, of course, be strong evidence that a valid contract was formed.   The parties' actions after the fact are relevant, and can sometimes be sufficient to demonstrate that a valid contract was formed.   *Nichols*, 2012 WL 777289 at *4 (detailing the plaintiff's use of loan funds, loan payments, and affirmance of the loan to find a contract, including arbitration clause, valid).   However, an affirmative statement or action is required to demonstrate acceptance of a contract; silence alone cannot prove either acceptance or ratification of an offered contract.   *See, e.g.*, *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed. Cir. 1998).   One party's failure to read or understand the terms of an otherwise valid contract, in the absence of exceptional circumstances such as fraud or concealment

of the terms, does not invalidate the contract or excuse performance.  *See Sedlock v. Moyle*, 668 S.E.2d 176, 180–81 (W. Va. 2008).

In the present case, there is no written contract evidencing either a loan or a cash withdrawal.   The Defendant contends that there was a meeting of the minds based on its factual scenario in which Dr. Spradlin, duly authorized by Mr. Spradlin, called and expressly requested a loan, thereby accepting the offer according to the terms built into the policies.   However, little evidence supports the Defendant's version of the facts.   Mr. Holbrook stated that he believes his conversation with Dr. Spradlin centered on policy loans, but stressed that his recollection was weak.   Even fully crediting his statements, his recollection is only to a conversation prior to the transactions.   He indicated that he could not recall any involvement in processing the transactions, and indeed became aware of them only when Mr. Spradlin contacted him in 2011 or 2012. (Holbrook Depo. at 17.) Both Plaintiffs vigorously deny requesting or authorizing a loan. Though they accepted and used the money, the Spradlins did nothing to affirm acceptance of a loan, as opposed to a cash withdrawal.

The Defendant places a great deal of reliance on the annual statements' reference to the alleged loans and on the policy language setting forth the terms of loans.   Simply failing to object to a statement received in the mail is not enough to create a loan contract.   Making interest payments on the loan, for example, would be strong evidence of acceptance or affirmation of the loan.   There is no evidence here that AXA Equitable mailed annual billed loan interest statements to the Spradlins, much less evidence of interest payments by the Spradlins.   Given the statements from Mr. Lewer and the customer service letters stating that annual billed loan interest notices would be mailed to all clients with policy loans, the absence of such notices here casts doubt on

16

both the existence of a loan and on the consistency of AXA Equitable's procedures.   AXA Equitable contends that Mr. Spradlin *must* have authorized the loan because its procedures ensure that such authority exists before a third party may take out a loan.   Even if the Court were to accept that the procedures in place are foolproof when followed, AXA Equitable provides no evidence that its procedures were followed in this instance.   AXA Equitable explains the lack of documentation and evidence in part by suggesting that documentation was created, but destroyed after seven (7) years pursuant to its document retention policy.   (Def.'s Resp. at 5.)   That explanation does little to assist the Defendant in meeting its burden.   AXA Equitable controlled what documentation was created at the time of the transaction, and it controlled the decision to destroy any such documentation despite claimed open, unpaid policy loans on the Spradlins' accounts.

As the party asserting the existence of an enforceable loan contract, AXA Equitable has the burden of proof as to contract formation.   Viewing all facts and inferences in the light most favorable to AXA Equitable, the Court finds that it has produced no evidence that would permit a reasonable jury to conclude that a valid policy loan contract was formed.   To defeat a motion for summary judgment, the non-moving party must come forward with "concrete evidence from which a reasonable juror could return a verdict in his favor."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).   The non-moving party cannot meet that burden "through mere speculation or the building of one inference upon another."   *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

AXA Equitable's evidence with respect to the mutual assent or "meeting of the minds" required to form a valid contract amounts to no more than a pyramid of speculation and inferences

17

with no factual basis.  It asks us to infer from Mr. Holbrook's recollection of discussing policy loans with Dr. Spradlin that she then sought out a loan, rather than a cash withdrawal.  With no evidence, no record, and no witness to the actual transaction, it asks us to speculate that the Spradlins called AXA Equitable's customer service center, that Mr. Spradlin authorized Dr. Spradlin to take out a loan on his policy, and that Dr. Spradlin requested policy loans on the policy she owned as well as on Mr. Spradlin's policy.  It asks us to speculate that the checks mailed to the Spradlins resulted from a request for a loan, rather than a request for a cash withdrawal. Finally, it asks that we infer from the Spradlins' failure to object to their policy statements that they had requested policy loans.  If policy loans were the only method of obtaining money from an insurance policy, the acceptance of the checks would constitute sufficient evidence to permit an inference that a loan was taken.  However, we are faced with the question of whether the Spradlins requested a policy loan *as opposed to* a partial cash withdrawal.  Given that either transaction would result in distribution of money, no reasonable jury could draw any inference at all from the Spradlins' acceptance of the checks.  AXA Equitable has produced no evidence of a meeting of the minds, or of any affirmative statement or act by the Spradlins that would support a finding that they accepted the policy loans offered in their policies.  Thus, no reasonable jury could find that a valid contract was formed, and summary judgment as to Count I must be granted to the Plaintiffs.

### B.  Truth in Lending Act (TILA) and West Virginia Consumer Credit and Protection Act (WVCCPA)

The Truth in Lending Act (TILA) regulates lenders extending credit to consumers.  The West Virginia Consumer Credit and Protection Act (WVCCPA) applies to West Virginia consumers entering into loan or other credit agreements.  W.Va. Code § 46-1-104.  Both statutes

are applicable only to extensions of credit.   While the parties have presented extensive argument regarding potential applicability to policy loans, neither party contends that these statutes have any bearing on cash withdrawals.   Given the Court's finding that the Plaintiffs are entitled to summary judgment on their declaratory judgment action, the transactions at issue were not loans.   Counts II and IV are therefore moot, as are the motions for summary judgment related to those counts.

### C. Unfair Trade Practices[11]

The Defendant asserts that it is entitled to summary judgment as to the Plaintiffs' allegations that the alleged policy loans violated West Virginia law and constitute unfair and deceptive trade practices in violation of the West Virginia Unfair Trade Practices Act (WVUTPA). The Plaintiffs allege that AXA Equitable charges an unlawful interest rate, mischaracterized partial withdrawals as loans, and failed to send them required notices.   The Defendant argues that the terms, including interest rates, of the alleged loans were contained in the policies and approved by the West Virginia Insurance Commissioner.   Any misunderstanding, according to the Defendant, arose from the Plaintiffs' own failure to read and understand their policies and annual statements.   Further, it asserts that the Plaintiffs' WVUTPA claims are barred by a one-year statute of limitations.   It asserts that the statute began to run when the loans were taken in 1989. If not then, the annual statements sent each year beginning in 1989 disclosed the loans.   At the latest, the Defendant argues that the Plaintiffs began discussing the loans with an insurance agent in 2009 or 2010, starting the statute of limitations.

---

11 The Plaintiffs' allegations and arguments with respect to the remaining counts are largely premised on the treatment of the transactions as loans.   However, at least portions of the allegations and asserted damages have some basis in AXA Equitable's conduct, rather than the status of the transactions, and are not fully resolved by the declaratory judgment ruling.

The Plaintiffs argue that the statute of limitations did not begin to run until "the confirmed date of the first contact between Plaintiffs' counsel and Defendant, which was October 16, 2012." (Pl.s' Resp. at 11.)   They assert that the doctrine of fraudulent concealment applies because the loans were issued without verifying them with the policy owners.   Though they learned of the loans and their potential impact in 2009 or 2010, they assert that they initially believed that their agent was at fault.   They claim that they had no information that AXA Equitable had caused the harm until fall of 2012, when they learned that the company permitted loans to be made based on an unverified telephone call.

The WVUTPA is designed to "regulate trade practices in the business of insurance."   W. Va. Code § 33-11-1.   The West Virginia Supreme Court held that "claims involving unfair settlement practices that arise under the Unfair Trade Practices Act…are governed by the one-year statute of limitations set forth in West Virginia Code § 55-2-12(c) (1994)."   Syl. Pt. 1, *Wilt v. State Auto. Mut. Ins. Co.*, 506 S.E.2d 608, 608 (W.Va. 1998).

As discussed in detail in Section III.A, there are factual disputes as to the initial transaction and AXA Equitable's subsequent behavior.   While those factual disputes were not material as to Count I, given the dearth of evidence that a valid contract for a policy loan was formed, they are material with respect to the question of whether AXA Equitable engaged in unfair trade practices. As discussed in Section III.A.i, the facts support the Spradlins' contention that AXA Equitable did not follow state law with respect to policy loans.[12]   Whether it deliberately mischaracterized the

---

12 The parties dedicate a considerable amount of argument to the question of whether W.Va. Code § 33-13-8(d) permits interest rates of 8% on policy loans absent additional "assurances" from the insurer.   That issue is not dispositive as to any claim, but the Court finds that the provision that "the insurance commission shall require the insurer to furnish such assurances as he deems necessary" does not impose an obligation on the insurance company apart from complying with any requests for information by the insurance commissioner.   The approval of rates is the province of the insurance commissioner.

transactions as loans and concealed the interest rate by failing to mail notices at the time of the loan and interest billing statements thereafter is a question of fact.

However, the Court finds that the Plaintiffs' case was filed outside the one-year statute of limitations.  Given the Plaintiffs' allegations and the Court's findings above, the statute of limitations did not begin to run on the date of the transactions, as there is no evidence that the Spradlins could have known AXA Equitable had treated the transactions as loans.  The annual statements up to at least 1998 provide scant information about the alleged loans, and a jury could find that a reasonable person would not be aware of the loans based on those documents. However, Mr. Spradlin learned that the policies were in danger of lapsing in 2009 or 2010, and received a letter stating the Defendant's position as to the asserted loans in May 2010.  That knowledge triggered the one-year statute of limitations.  More investigation was undoubtedly needed before he could initiate this suit, but statutes of limitations are designed to permit investigation to take place between an event and the initiation of a lawsuit.   The Spradlins may not have understood the legal ramifications of the policy loans until they retained counsel, but they knew that AXA Equitable classified the transactions as loans in 2010 at the latest.   At that time, they knew that they had not requested loans or received paperwork or documentation other than the annual statements.   Thus, they had the information necessary to start the running of the statute of limitations no later than 2010.   Therefore, the statute of limitations bars Count III and the Defendant's motion for summary judgment as to that count must be granted.

### D.  Fraud

The Plaintiffs allege that AXA Equitable misrepresented and concealed the nature of the transactions and the accrual of interest on the alleged loans.  The Defendant argues that the

Plaintiffs have no evidence supporting the allegation of misrepresentation or concealment.   It further asserts that the two-year statute of limitations bars the fraud claim.   The Plaintiffs respond that the characterization of the transactions as loans, with no direct contact for many years, constitutes fraud.   They rest on the same arguments presented for the WVUTPA claim with respect to the statute of limitations.

Although the Plaintiffs' evidence of fraud is thin, a jury could draw the inference that AXA Equitable deliberately misled them by processing a partial cash withdrawal request as a loan request, then failing to send them required documentation.   However, for the reasons stated in Section III.C, the statute of limitations bars the Plaintiffs' fraud claims.   The Plaintiffs cannot point to any specific evidence that was unavailable to them prior to October 2012, when they assert the statute should begin to run.   Even if the annual statements did not constitute sufficient notice, Mr. Kerns' 2009 or 2010 conversation with Mr. Spradlin, notifying him of the risk that the policies would lapse due to the loans taken in 1989, provided knowledge of the basic facts supporting the fraud allegations.   Thus, the Defendant's motion for summary judgment as to Count V must be granted.

### E.  Breach of Fiduciary Duty

Finally, the Plaintiffs allege that the trust they placed in their insurance agent at the time of the transaction, Mr. Holbrook, created a fiduciary relationship between AXA Equitable and the Spradlins.   The Defendant asserts that West Virginia law does not recognize a fiduciary relationship between insurers and insureds.   Further, it again argues that the two-year statute of limitations bars the Plaintiffs' claim of breach of fiduciary duty.   The Plaintiffs respond that their close personal relationship with Mr. Holbrook created a fiduciary relationship, and incorporate their arguments with respect to the statute of limitations on the previous counts.

22

A fiduciary duty is "a duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person."   *Manor Care, Inc. v. Douglas*, 2014 WL 2835831, at *16 (W. Va. June 18, 2014) (internal quotation marks, brackets, and citations omitted).   Such a relationship "is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship."   *Id.* (quoting 36A C.J.S. *Fiduciary,* p. 385 (1961)); *see also Cather v. Seneca-Upshur Petroleum, Inc.*, 2010 WL 3271965, at *5 (N.D.W. Va. Aug. 18, 2010) (noting that a fiduciary duty "is to be imposed only upon one who has agreed to support another's interests above his own").   The West Virginia Supreme Court "has never recognized the relationship between an insurer and its insured" as a fiduciary relationship.   *Elmore v. State Farm Mut. Auto. Ins. Co.*, 504 S.E.2d 893, 900 (W. Va. 1998) (emphasis omitted) (holding that an insurer and third-party claimant did not have a fiduciary relationship).

The Spradlins assert that they placed a great deal of trust in Mr. Holbrook.   He was their friend as well as their insurance agent, and the policies were too complex for them to understand or manage without his assistance.   (Pl.s' Resp. at 19–20.)   There is no evidence, however, that Mr. Holbrook or AXA Equitable accepted that trust or agreed to support the Spradlins' interests above the company's interests.   Thus, the Plaintiffs have not met their burden of producing evidence to demonstrate a genuine question of material fact that would permit a jury to decide that there was a fiduciary relationship.

Further, as discussed in detail in Section III.C, the statute of limitations began to run no later than 2010, when the Spradlins learned from Mr. Kerns that their policies were in danger of

lapsing due to the 1989 transactions classified by AXA Equitable as loans.   Accordingly, the Defendant is entitled to summary judgment as to Count VI of the complaint.

### CONCLUSION

WHEREFORE, following careful consideration, for the reasons stated herein, the Court hereby **ORDERS** that the *Plaintiffs' Motion for Partial Summary Judgment* (Document 49) be **GRANTED** as to Count I, and that the *Defendant AXA Equitable Life Insurance Company's Motion for Summary Judgment* (Document 51) be **DENIED** as to Count I.   The Court further **ORDERS** that the Plaintiffs' *Motion* as to Count II and the Defendant's *Motion* as to Counts II and IV be **DENIED AS MOOT,** and that the Defendant's *Motion* as to Counts III, V, and VI be **GRANTED**.   Finally, the Court **ORDERS** that any outstanding motions be **TERMINATED AS MOOT**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record, to any unrepresented party, and to Magistrate Judge Cheryl Eifert.

ENTER:        October 22, 2014

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA